

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| In re:<br><br>KIRK LEE JENSEN AND LINDA JEAN JENSEN,<br><br>Debtors. | Case No. 2:08-bk-15225 ER<br><br>Chapter 7<br><br>**MEMORANDUM OF DECISION**<br><br>Date:    October 16, 2008<br>Time:    11:00 A.M.<br>Place:   Ctrm. 1568, 15th Fl.<br>         255 E. Temple Street<br>         Los Angeles, CA 90012 |
|---|---|

Among the significant changes effected by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA")[1] was the introduction of the § 707(b)(2) Means Test.[2] Designed to ferret out abusive bankruptcy petitions, the Means Test creates a "presumption of abuse" if the debtor's Current Monthly Income (CMI)—as determined by a detailed statutory formula—is above a

---

[1] Pub. L. No. 109-8, 119 Stat. 23 (2005).
[2] Unless otherwise indicated, all statutory citations refer to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

-1-

certain amount. Debtors unable to rebut the presumption of abuse may have their cases dismissed or be required to fund a Chapter 13 plan. However, even debtors who survive the Means Test may see their cases dismissed pursuant to § 707(b)(3)(B), which permits the Court to dismiss a case if "the totality of the circumstances … of the debtor's financial situation demonstrates abuse."

The present case requires the Court to determine the extent to which the § 707(b)(3)(B) totality of the circumstances test is constrained by the § 707(b)(2) Means Test. The United States Trustee ("UST") contends that in conducting the § 707(b)(3)(B) totality of the circumstances analysis, one of the factors the Court may consider is the amount of secured debt the debtors have chosen to reaffirm. Debtors Kirk Lee Jensen and Linda Jean Jensen ("Debtors") disagree, pointing out that the Means Test does not consider a debtor's choice to reaffirm secured debt in determining whether the presumption of abuse arises. If reaffirmed secured debt does not affect the Means Test determination, the Debtors argue, then neither can it affect the §707(b)(3)(B) totality of the circumstances analysis. The UST's rejoinder is that as a separate provision, §707(b)(3) is not in any way constrained by § 707(b)(2).

The Court declines to fully embrace the position of either the debtors or the UST. Instead, the Court concludes that although the § 707(b)(3)(B) totality of the circumstances analysis must be undertaken independently of the provisions of § 707(b)(2), the § 707(b)(3)(B) analysis cannot reach a result inconsistent with the implicit policies of the § 707(b)(2) Means Test. Thus,

absent additional indicia of abuse, a debtor's choice to reaffirm a high amount of secured debt is not a basis for dismissing the debtor's Chapter 7 petition under § 707(b)(3)(B).

**I. Facts and Procedural Background**

This matter is before the Court on the U.S. Trustee's Motion to Dismiss Chapter 7 Case Pursuant to 11 U.S.C. §§ 707(b)(1) and (b)(3)(B) ("Motion to Dismiss"). *See* Dkt. 12. The Court has jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157, and General Order No. 266 of the U.S. District Court for the Central District of California.

Kirk Lee Jensen and Linda Jean Jensen ("Debtors") filed a voluntary Chapter 7 petition in April 2008, seeking a discharge of $87,234 in unsecured debt. Debtors' Schedule J reports average monthly income of $8,622.51 and average monthly expenses of $8,893, leaving a monthly deficit of $270.49. In their Chapter 7 Statement of Intention, Debtors stated that they would reaffirm their secured-debt obligations on a motor home, boat, and single family home. Debtors owe $63,256 on the motor home, $30,423 on the boat, and $800,754 on the single family home. Debtors make monthly payments of $396 on the motor home, $760 on the boat, and $4,446 on the single-family home. All three assets are now worth between 5% and 13% less than what the Debtors owe on them.[3]

---

[3] The motor home, on which Debtors owe $63,256, is now worth only $60,000 (5.15% less than what Debtors owe). The boat, on which Debtors owe $30,423, is worth $26,423 (13.17% less than what Debors owe). The single-family home, on which Debtors owe $800,754, is worth $745,000 (6.96% less than what Debtors owe).

Debtors purchased the motor home, boat, and single-family home in April of 2006, approximately two years before filing for bankruptcy. At that time, Debtors had sufficient income to afford these items. Debtor Kirk Jensen's income in 2006 was $114,000; in 2007, his income increased to $152,000. However, in 2008, as the economy deteriorated, Jensen's overtime hours were substantially reduced. The resulting loss of income precipitated the present bankruptcy petition.

The UST concedes that Debtors' petition does not trigger the "presumption of abuse" under the § 707(b)(2) Means Test. However, the UST argues that the Debtors' petition should nonetheless be dismissed pursuant to § 707(b)(3)(B) because the "totality of the circumstances … of the debtors' financial situation demonstrates abuse." The UST notes that but for the Debtors' secured debt payments on the motor home and boat, the Debtors would have $450.51 in monthly income available to repay their unsecured creditors.[4] Over a 60-month period, this would enable the Debtors to repay $24,327 (or approximately 28%) of their unsecured debt.[5] Motion to Dismiss 12. The motor home and boat, the UST argues, are luxury items which the Debtors should not be permitted to retain to the detriment of their unsecured creditors. *Id.* at 9.

---

[4] To arrive at this figure, the UST subtracted payments for the boat and motor home from Debtors' Schedule J average monthly expense. The UST also increased the Debtors' average monthly expense by a net $200. To reach the net $200 per month increase, the UST added in $325 per month to cover the Debtors' anticipated additional daycare expenses, but subtracted the $125 per month deduction the Debtors claimed for an "emergency expenses" account. The UST maintains that the emergency expenses account is simply a savings account for non-specific expenses.

[5] The UST computed the $24,327 figure based on payments of $450.51 per month over 60 months, less a 10% fee for a hypothetical Chapter 13 trustee.

The Debtors argue that their decision to reaffirm their obligations on the motor home and boat cannot form the basis for the Court to dismiss their petition under the § 707(b)(3)(B) totality of the circumstances test. Noting that the Means Test expressly permits the deduction of monthly secured debt payments from Current Monthly Income, § 707(b)(2)(A)(iii), the Debtors argue that relying upon those same monthly secured debt payments as a basis for dismissal under the totality of the circumstances test would contravene Congressional policy. Debtor's Opposition to UST's Motion to Dismiss ("Opposition") (Dkt. 13) at 4.

The Debtors concede that in conducting the totality of the circumstances test, the Court may assess aspects of their financial situation that are not provided for by the Means Test. But expenses which are already considered in the Means Test calculation, the Debtors maintain, are off-limits: "While § 707(b)(3) allows the court to examine the 'totality of the circumstances,' it does not allow the court to change congressionally mandated calculations." Opposition at 4.

## II. Discussion

### A. Interaction Between the § 707(b)(2) Means Test and the § 707(b)(3)(B) Totality of the Circumstances Test

Resolving this dispute over the meaning of "totality of the circumstances" requires an examination of the structure of § 707(b), which was substantially revised by BAPCPA. Prior to BAPCPA, § 707(b) stated simply that the Court "may dismiss a case … if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter." The pre-

BAPCPA code did not elaborate on what type of debtor conduct would constitute "substantial abuse."

BAPCPA retained the language permitting the Court to dismiss cases for abuse, although it lowered the standard from "substantial abuse" to "abuse." The more significant change was Congress's decision to further define the conduct constituting "abuse" in §§ 707(b)(2) and (b)(3), a task that had previously been left entirely to the courts. Section 707(b)(2) sets forth the Means Test, which creates a rebuttable presumption of abuse if the debtor's current monthly income (CMI), reduced by statutorily permitted expenses, exceeds a certain threshold. Section 707(b)(3) sets forth additional considerations for the Court to evaluate in determining whether the case is abusive— specifically, "whether the debtor filed the petition in bad faith," or whether "the totality of the circumstances of … of the debtor's financial situation demonstrates abuse."

Courts and commentators have struggled to define the interaction between §§ 707(b)(2) and (b)(3). At least one court has held, in support of the Debtor's position, that "while ability to pay is a factor in the totality of circumstances test, and may even be the primary factor to be considered, if it is the only indicia of abuse, the case should not be dismissed under that test." *In re Nockerts*, 357 B.R. 497 (Bankr. E.D. Wis. 2006). This view is shared by commentators Culhane and White, who contend "that Congress intended the means test to be the only test of ability to pay under the revised Code":

> With the detailed statutory means test in place, "filed in bad faith" and "totality of the

circumstances" no longer authorize judges to define ability to pay. Instead, these phrases must be read as limited to serious debtor misconduct.… The text and structure of the amended Code strongly suggest that the highly detailed means test is to replace, not just precede, other measures of ability to repay. Standard rules of interpretation direct courts to construe statutes so that all parts have meaning, and when both general and specific provisions cover the same subject matter, to let the specific provisions control. Use of judicial can-pay tests violates both of these rules, making the means test superfluous, and allowing general phrases to govern the specific. Section 707(b) as a whole makes sense when subsection two's means test governs ability to pay and subsection three covers debtor misconduct. Marianne B. Culhane and Michaela M. White, *Catching Can-Pay Debtors: Is the Means Test the Only Way?*, 13 Am. Bankr. Inst. L. Rev. 665, 666-67 (2005).

But the majority of courts and commentators disagree with the *Nockerts* court and with Culhane and White, holding instead that the plain language of § 703(b)(3) permits consideration of the debtor's ability to pay: "By its terms, § 707(b)(3) 'explicitly mandates that the totality of the circumstances of the Debtor's financial situation be considered in determining whether there is an abuse when the presumption of abuse under paragraph (b)(2) does not arise or is rebutted.' The broad language 'totality of the circumstances' and 'financial situation' clearly encompasses

a debtor's ability to pay." *In re Lenton*, 358 B.R. 651, 663 (Bankr. E.D. Pa. 2006) (citing *In re Paret*, 347 B.R. 12, 15 (Bankr. D. Del. 2006)). *See also In re Zaporski*, 366 B.R. 758, 771 (Bankr. E.D. Mich. 2007) ("[The] plain language [of § 707(b)(3)(B)] is broad enough to encompass, indeed require, consideration of those facts that are probative of a debtor's ability to repay his or her creditors."); *In re O'Brien*, 373 B.R. 503, 506 ("This Court has observed, as have others, that § 707(b)(3) is best understood as a codification of pre-BAPCPA case law. Under pre-BAPCPA law, a debtor's ability to pay was a primary consideration in any § 707(b) analysis."); *In re McUne*, 358 B.R. 397, 398 (Bankr. D. Or. 2006) ("A debtor's actual ability to pay a portion of his unsecured debts may be considered as part of the totality of the circumstances of the debtor's financial situation under § 707(b)(3)."); *In re Henebury*, 361 B.R. 595, 611 (Bankr. S.D. Fla. 2007) ("In determining [under § 707(b)(3)(B)] if the granting of relief would be an abuse of the provisions of Chapter 7, courts are required to determine if the debtor has the ability to pay a substantial portion of their unsecured claims through a Chapter 13 plan based upon the totality of the debtor's financial circumstances.").

    B. *The § 707(b)(3)(B) Totality of the Circumstances Test Allows Courts to Fine-Tune the § 707(b)(2) Means Test Presumption*

The Court agrees with those authorities holding that the Means Test is only the first step in determining whether a debtor's

-8-

petition is abusive. The Means Test functions as an initial screen to weed out those Chapter 7 petitions that are most clearly abusive. As one court explains, "Congress intended that there be an easily applied formula for determining when the Court should *presume* that a debtor is abusing the system by filing a chapter 7 petition." *In re Fowler*, 349 B.R. 414, 420-21 (Bankr. D. Del. 2006). However, as with any bright-line rule, the Means Test presumption does not always provide the most accurate snapshot of the debtor's financial situation. That is to be expected; a formula complex enough to accurately predict every single debtor's ability to pay would be impossible to effectively administer. The Means Test sacrifices some level of accuracy in the interest of administrative efficiency.

Fortunately, the Bankruptcy Code anticipates that the Means Test alone cannot eliminate every single abusive filing and provides a backstop, the § 707(b)(3)(B) totality of the circumstances test. The totality of the circumstances test is best seen as providing a chance for the Court to refine the Means Test estimate. Since it permits individualized case-by-case examination, the totality of the circumstances test can weigh unusual circumstances that the Means Test does not—and could not reasonably be expected to—account for.

For example, the Means Test computes a debtor's Current Monthly Income (CMI) as the average of the debtor's income over the past six months. In the case of debtors who have recently changed jobs, CMI may bear little resemblance to actual monthly income. In fact, Debtors whose CMI diverges from their actual monthly income constitute a substantial portion of those debtors

who survive the Means Test only to see their cases dismissed under the totality of the circumstances test. In *In re Pak*, the Means Test presumption of abuse did not arise because the debtor had been unemployed for most of the six months preceding his bankruptcy petition. 343 B.R. 239, 241 (Bankr. N.D. Cal. 2006). Substituting the debtor's actual monthly income for his CMI, the *Pak* court concluded that the debtor had the ability to repay a substantial portion of his unsecured debt, and accordingly dismissed his case as abusive under the totality of the circumstances test. *Id.* at 246-47. *See also Henebury, supra,* at 613-14 (dismissing case because debtor's newly acquired job would provide substantial income to repay unsecured creditors).

Another way courts fine-tune the Means Test determination is by considering a debtor's actual expenditures, which often are not the same as the estimated expenditures used to determine the Means Test presumption. For example, the Means Test permits debtors to subtract from CMI payments on a residence they do not plan on retaining (on the theory that such payments provide an estimate of a debtor's eventual housing expenses). In *In re Haar*, debtors passed the Means Test, largely because of substantial mortgage payments on a residence they intended to surrender. In conducting the totality of the circumstances analysis, the court noted that debtor's monthly mortgage payments of $2,243 had been replaced by monthly rental payments of $888—leaving substantial income to pay unsecured creditors. The *Haar* court dismissed the case as an abuse of Chapter 7. *See also In re Edighoffer*, 375 B.R. 789, 794 (Bankr. N.D. Ohio 2007) (considering debtor's actual rent expense, which was only one-

third of debtor's mortgage expense on property that was to be surrendered, in conducting the totality of the circumstances analysis).

### C. The § 707(b)(3)(B) Totality of the Circumstances Determination Must Respect Policies Implicit in the § 707(b)(2) Means Test

Although courts in the cases discussed above use the totality of the circumstances test to refine the Means Test determination, the adjustments the courts make are nonetheless consistent with the underlying policies of the Means Test. By contrast, in the present case, the UST asks the Court to use the totality of the circumstances test in a manner that directly contradicts the policies implicit in the Means Test. Specifically, the UST asks the Court to classify the Debtors' monthly secured debt payments on reaffirmed obligations as income available to repay unsecured creditors, even though the Means Test allows such payments to be deducted from CMI.

In the cases discussed above, the courts substituted debtor's actual payments on various obligations for the estimated payments used in the Means Test. In this case, the UST is not asking the court to replace the Means Test's payment estimate with a more precise estimate of the debtor's actual payments. Instead, the UST requests that the entire amount of income the Debtors allocate to secured debt payments debt be considered as income available to pay unsecured creditors. Rather than fine-tuning the Means Test presumption in accordance with the facts

of an individual case, the UST asks the Court to completely disregard the policies implicit in the Means Test.

"It is a cardinal principle of statutory construction that the statute ought, upon the whole to be so construed that, if it can be prevented, no clause, sentence or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). Congress has specified that for purposes of determining the presumption of abuse, a debtor's monthly payments on account of secured debt shall not be considered. § 707(b)(2)(A)(iii). Considering such payments under the § 707(b)(3)(B) totality of the circumstances test would render the language in § 707(b)(2) disallowing consideration of those payments superfluous, void, and insignificant.

> D. *Dismissal Under the § 707(b)(3)(B) Totality of the Circumstances Test is Justified if Additional Indicia of Abuse are Present*

This is not to say that the Court may never classify a debtor's secured debt payments on reaffirmed obligations as income available to pay unsecured creditors. Such a classification may be appropriate where other indicia of abuse are present. While it is impossible to provide an exhaustive list of the myriad ways in which debtors could abuse Chapter 7, common forms of abuse include purchases made on the eve of bankruptcy and purchases that cause the debtor to become insolvent. For example, one court invoked the totality of the circumstances test to dismiss the debtor's Chapter 7 petition based on the debtor's intent to reaffirm secured-debt payments

on an SUV purchased only twelve days prior to filing. *In re Worrell*, 2007 WL 3374593, at *4 (Bankr. N.D. Iowa 2007).

Defining eve-of-bankruptcy purchases by reference to a precise timetable (e.g., a purchase made $X$ days prior to filing is presumptively abusive) would be counterproductive, as enterprising debtors would simply consult the timetable and make their purchases one day before. Furthermore, determining whether an eve-of-bankruptcy purchase is abusive under the totality of the circumstances test is a case-by-case inquiry that, as the test suggests, must be made only after considering all the relevant circumstances peculiar to each debtor's individual case.

However, several generally applicable considerations are worth noting. First, to avoid triggering a determination of abuse, more expensive purchases must be made further in advance of filing for bankruptcy than less expensive purchases. For example, the presumption of abuse is more likely to be triggered by a debtor who purchases a new $50,000 luxury car 60 days before filing than it is by a debtor who purchases a $5,000 used car 30 days before filing.

Whether a purchase is expensive must be evaluated in light of the financial situation of each individual debtor. This can be done by calculating the percentage of the debtor's monthly income necessary to fund the purchase. To illustrate, the purchase of a $20,000 car would be considered expensive as to a debtor who was required to devote 40% of monthly income to the payments; whereas the same purchase would not be considered expensive as to a debtor required to devote only 5% of monthly

income to the payments. *See also Worrell, supra*, at *4 (filing was abusive where debtors purchased two cars requiring total payments equal to 38% of their monthly income; debtors purchased one car twelve days before filing and the other ninety days before filing).

Second, purchases that cause the debtor to become insolvent generally give rise to a determination of abuse, regardless of the length of time that elapses between the purchase and the bankruptcy filing. The Bankruptcy Code is intended to afford relief to the "honest but unfortunate debtor," not to the debtor who makes purchases that she knows she cannot afford. *Brown v. Felson*, 442 U.S. 127, 128 (1979) (citing *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)).

### E. The Debtors' Petition Was Not Abusive Within the Meaning of the § 707(b)(3)(B) Totality of the Circumstances Test

This case does not present indicia of abuse sufficient to justify classifying the Debtors' secured-debt payments as income available to pay unsecured creditors, a classification that would require the Court to find that the Debtors' Chapter 7 petition is abusive. The Debtors did not incur the secured debt obligations at issue shortly before bankruptcy. Instead, the Debtors purchased the boat and the motor home two years prior to filing. Furthermore, the purchase of the boat and the motor home did not precipitate the Debtors' insolvency. At the time Debtors made the purchases in 2006, they had monthly income of $9,500. The total monthly debt service on the purchases was $1,156, or approximately 12% of the Debtors' monthly income. In 2007,

Debtors' monthly income increased to $12,649; as a result, Debtors were required to devote only 9% of their monthly income to payments on the boat and motor home. Debtors were forced to file for bankruptcy not because they spent more on luxury goods than they could afford, but rather because the declining economy adversely impacted Debtor Kirk Jensen's salary.

### F. Refusing to Permit Debtors to Reaffirm Secured Debt Would Contravene the Favorable Treatment for Secured Creditors that Congress Expressly Provided for in § 707(b)(2)

Some courts refusing to permit debtors to reaffirm high levels of secured debt have emphasized the unfairness to unsecured creditors. These courts understandably bristle at the prospect of permitting debtors to continue enjoying luxury goods at the expense of their unsecured creditors. One court confronting the issue aptly observed that "there is no practicable reason why the Debtors need to continue maintaining a 'Pop-Up Camper' and an extra vehicle, the 2002 Ford Windstar." *In re Oot*, 368 B.R. 662, 667 (Bankr. N.D. Ohio 2007).

This Court certainly shares the sense of discomfort other courts have felt at the prospect of permitting debtors to retain luxury goods in defiance of their unsecured creditors. However, the Bankruptcy Code seeks to further policies other than making unsecured creditors, especially in situations where unsecured creditors can be made whole only at the expense of secured creditors. Chief among these policies is advancing the availability of secured credit. *See, e.g., In re Proalert, LLC*,

314 B.R. 436, 441 (9th Cir. B.A.P. 2004) ("Embodied in the Bankruptcy Code is a policy decision to protect secured credit practices.").

Were the Court to adopt the UST's position, many debtors would be forced to default on their secured credit obligations as a precondition of obtaining Chapter 7 relief. While secured lenders could look to the collateral to make them whole, in many cases—including this one—the value of the collateral would be insufficient to satisfy the underlying obligation. The costs of repossessing and reselling the collateral would further reduce the secured creditor's recovery.

The case of *In re Oot* illustrates the problem from the perspective of secured creditors. In that case, the Court found "especially disconcerting" the debtors' decision to reaffirm a vehicle whose value was at least $10,000 less than what was owed on it. *Oot, supra*, at 667. Viewing the situation exclusively from the perspective of unsecured creditors, the debtors' decision is indeed troubling—money that could go to unsecured creditors is instead devoted to making payments on a vehicle encumbered by far more debt than it is worth.

What the *Oot* court failed to account for is that the debtor's decision to reaffirm is a zero-sum game, in which either secured creditors or unsecured creditors will emerge the winners. Had the Court permitted the debtors to reaffirm their obligation on the vehicle, their secured creditors would be spared the loss of $10,000 associated with disposing of underwater collateral, but their unsecured creditors would get nothing. Since the court did not allow the debtors to reaffirm, their unsecured creditors

received some recovery, but their secured creditors sustained losses of at least $10,000.

Therefore, refusing to permit debtors to reaffirm does more than punish the debtors—it also reallocates the balance of risk between secured and unsecured creditors. As one commentator has observed, in the zero-sum battle between secured and unsecured creditors, "the secured creditor's advantage is the unsecured creditor's disadvantage." Homer Kripke, *Law and Economics: Measuring the Economic Efficiency of Commercial Law in a Vacuum of Fact*, 133 U. Pa. L. Rev. 929, 949 (1985). As demonstrated by the Means Test's provisions permitting the deduction of secured-debt obligations from CMI, Congress has conferred an advantage on secured creditors by giving debtors the option of reaffirming secured debt. Although Congress's choice to confer various advantages upon secured creditors is controversial,[6] it is a legislative choice that the Court will not disturb. Of course, the unintended but unavoidable consequence of this Congressional decision to favor secured credit is that some debtors will be able to retain luxury goods if they are willing to continue making the secured debt payments, even if that means their unsecured creditors will not always be made whole.

The Court also notes that an interpretation of § 707(b)(3) which permits debtors to reaffirm high levels of secured debt is

---

[6] *See, e.g.*, Lynn M. Lopucki, *The Unsecured Creditor's Bargain*, 80 Va. L. Rev. 1887, 1946-47 (1994) (lamenting the "unsecured creditors' loss of power when the case moves to bankruptcy" and describing bankruptcy as "the unsecured creditor's … nemesis"); Robert E. Scott, *A Relational Theory of Secured Financing*, 86 Colum. L. Rev. 901, 902 (1986) (noting that the "benefits to secured creditors from taking security are offset by the increased costs to unsecured creditors who face a corresponding reduction in the pool of assets available to them upon default.").

consistent with other provisions of the Bankruptcy Code that extend favorable treatment to secured creditors. For example, § 363(e) entitles holders of secured claims to "adequate protection" of those claims under certain circumstances. As explained by the Supreme Court, § 363(e) requires the bankruptcy court to "place such limits or conditions on the trustee's power to sell, use, or lease [the secured creditor's] property as are necessary to protect the creditor." *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204 (1983). Similarly, secured creditors are entitled to relief from the automatic if they can satisfy the requirements of § 362(d).

Finally, substantial policy considerations support the Court's holding. As one scholar has pointed out, an "essential aspect of granting security, from the viewpoint of both the secured creditor's interests and society's interest in plentiful credit and rapid credit decisions, is the favored treatment of secured creditors in the law of bankruptcy." Kripke, *supra*, at 948. Refusing to permit debtors to reaffirm their secured debt obligations would take away one aspect of the favorable treatment secured creditors receive in bankruptcy and would correspondingly reduce the availability of secured credit. *Cf.* Nobelman v. American Savings Bank, 508 U.S. 324, 332 (1993) (Stevens, J., concurring) (explaining that the Bankruptcy Code's "favorable treatment of residential mortgagees was intended to encourage the flow of capital into the home lending market").

**Conclusion**

For the reasons stated above, the UST's Motion to Dismiss Debtors' case for abuse under the § 707(b)(3)(B) totality of the circumstances test is denied. The court will enter an appropriate order.

DATED: November 12, 2008

_____

Hon. Ernest M. Robles
United States Bankruptcy Judge