FILED & ENTERED

APR 28 2009

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gonzalez DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re:<br><br>   KIRK LEE JENSEN AND LINDA JEAN<br>   JENSEN,<br><br>                          Debtors. | Case No. 2:08-bk-15225 ER<br><br>Chapter 7<br><br>**AMENDED MEMORANDUM OF DECISION**<br><br>Date:   February 19, 2009<br>Time:   11:00 A.M.<br>Place:  Ctrm. 1568, 15th Fl.<br>        255 E. Temple Street<br>        Los Angeles, CA 90012 |

Among the significant changes effected by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA")[1] was the introduction of the § 707(b)(2) Means Test.[2] Designed to ferret out abusive bankruptcy petitions, the Means Test creates a "presumption of abuse" if the debtor's Current Monthly Income (CMI)—as determined by a detailed statutory formula—is above a

---

[1] Pub. L. No. 109-8, 119 Stat. 23 (2005).
[2] Unless otherwise indicated, all statutory citations refer to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

certain amount. Debtors unable to rebut the presumption of abuse
may have their cases dismissed or be required to fund a Chapter
13 plan. However, even debtors who survive the Means Test may
see their cases dismissed pursuant to § 707(b)(3)(B), which
permits the Court to dismiss a case if "the totality of the
circumstances … of the debtor's financial situation demonstrates
abuse."

The present case requires the Court to determine the extent
to which the § 707(b)(3)(B) totality of the circumstances test
is constrained by the § 707(b)(2) Means Test. The United States
Trustee ("UST") contends that in conducting the § 707(b)(3)(B)
totality of the circumstances analysis, one of the factors the
Court may consider is the amount of secured debt payments the
debtors have chosen to make on property they plan to retain.
Debtors Kirk Lee Jensen and Linda Jean Jensen ("Debtors")
disagree, pointing out that the Means Test's presumption of
abuse computation does not take into account the amount of a
debtor's secured debt payments. If secured debt payments do not
affect the Means Test determination, the Debtors argue, then
neither can they affect the § 707(b)(3)(B) totality of the
circumstances analysis. The UST's rejoinder is that as a
separate provision, § 707(b)(3) is not in any way constrained by
§ 707(b)(2).

The Court declines to fully embrace the position of either
the debtors or the UST. Instead, the Court concludes that
although the § 707(b)(3)(B) totality of the circumstances
analysis must be undertaken independently of the provisions of
§ 707(b)(2), the § 707(b)(3)(B) analysis cannot reach a result

inconsistent with the implicit policies of the § 707(b)(2) Means
Test. Thus, absent additional indicia of abuse, a debtor's
choice to continue to make secured-debt payments on retained
property is not a basis for dismissing the debtor's Chapter 7
petition under § 707(b)(3)(B).

**I.    Facts and Procedural Background**

This matter is before the Court on the U.S. Trustee's
Motion to Dismiss Chapter 7 Case Pursuant to 11 U.S.C.
§§ 707(b)(1) and (b)(3)(B) ("Motion to Dismiss"). *See* Dkt. 12.
The Court entered its initial Memorandum of Decision and Order
on November 12, 2008. Dkt. 21-22. The Court subsequently granted
the UST's Motion to Reconsider (Dkt. 24) and heard additional
argument on the Motion to Dismiss on February 19, 2009. The
Court has jurisdiction pursuant to 28 U.S.C. § 1334(a), 28
U.S.C. § 157, and General Order No. 266 of the U.S. District
Court for the Central District of California.

Kirk Lee Jensen and Linda Jean Jensen ("Debtors") filed a
voluntary Chapter 7 petition in April 2008, seeking a discharge
of $87,234 in unsecured debt. Debtors' Schedule J reports
average monthly income of $8,622.51 and average monthly expenses
of $8,893, leaving a monthly deficit of $270.49. In their
Chapter 7 Statement of Intention, Debtors stated that they would
retain their motor home, boat, and single family home and
continue to make regular payments. Debtors owe $63,256 on the
motor home, $30,423 on the boat, and $800,754 on the single
family home. Debtors make monthly payments of $396 on the motor
home, $760 on the boat, and $4,446 on the single-family home.

All three assets are now worth between 5% and 13% less than what the Debtors owe on them.[3]

Debtors purchased the motor home, boat, and single-family home in April of 2006, approximately two years before filing for bankruptcy. At that time, Debtors had sufficient income to afford these items. Debtor Kirk Jensen's income in 2006 was $114,000; in 2007, his income increased to $152,000. However, in 2008, as the economy deteriorated, Jensen's overtime hours were substantially reduced. The resulting loss of income precipitated the present bankruptcy petition.

The UST concedes that Debtors' petition does not trigger the "presumption of abuse" under the § 707(b)(2) Means Test. However, the UST argues that the Debtors' petition should nonetheless be dismissed pursuant to § 707(b)(3)(B) because the "totality of the circumstances … of the debtors' financial situation demonstrates abuse." The UST notes that but for the Debtors' secured debt payments on the motor home and boat, the Debtors would have $450.51 in monthly income available to repay their unsecured creditors.[4] Over a 60-month period, this would

---

[3] The motor home, on which Debtors owe $63,256, is now worth only $60,000 (5.15% less than what Debtors owe). The boat, on which Debtors owe $30,423, is worth $26,423 (13.17% less than what Debors owe). The single-family home, on which Debtors owe $800,754, is worth $745,000 (6.96% less than what Debtors owe).

[4] To arrive at this figure, the UST subtracted payments for the boat and motor home from Debtors' Schedule J average monthly expense. The UST also increased the Debtors' average monthly expense by a net $200. To reach the net $200 per month increase, the UST added in $325 per month to cover the Debtors' anticipated additional daycare expenses, but subtracted the $125 per month deduction the Debtors claimed for an "emergency expenses" account. The UST maintains that the emergency expenses account is simply a savings account for non-specific expenses.

-4-

enable the Debtors to repay $24,327 (or approximately 28%) of
their unsecured debt.[5] Motion to Dismiss 12. The motor home and
boat, the UST argues, are luxury items which the Debtors should
not be permitted to retain to the detriment of their unsecured
creditors. *Id.* at 9.

The Debtors argue that their decision to retain the motor
home and boat cannot be the basis for dismissal under the
§ 707(b)(3)(B) totality of the circumstances test. Noting that
the Means Test expressly permits the deduction of monthly
secured debt payments from Current Monthly Income,
§ 707(b)(2)(A)(iii), the Debtors argue that relying upon those
same monthly secured debt payments as a basis for dismissal
under the totality of the circumstances test would contravene
Congressional policy. Debtor's Opposition to UST's Motion to
Dismiss ("Opposition") (Dkt. 13) at 4.

The Debtors concede that in conducting the totality of the
circumstances test, the Court may assess aspects of their
financial situation that are not provided for by the Means Test.
But expenses which are already considered in the Means Test
calculation, the Debtors maintain, are off-limits: "While
§ 707(b)(3) allows the court to examine the 'totality of the
circumstances,' it does not allow the court to change
congressionally mandated calculations." Opposition at 4.

---

[5] The UST computed the $24,327 figure based on payments of
$450.51 per month over 60 months, less a 10% fee for a
hypothetical Chapter 13 trustee.

## II.    Discussion

*A.    Interaction Between the § 707(b)(2) Means Test and the §
707(b)(3)(B) Totality of the Circumstances Test*

Resolving this dispute over the meaning of "totality of the circumstances" requires an examination of the structure of § 707(b), which was substantially revised by BAPCPA. Prior to BAPCPA, § 707(b) stated simply that the Court "may dismiss a case … if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter." The pre-BAPCPA code did not explain what conduct constituted "substantial abuse."

BAPCPA retained the language permitting the Court to dismiss cases for abuse, although it lowered the standard from "substantial abuse" to "abuse." The more significant change was Congress's decision to further define the conduct constituting "abuse" in §§ 707(b)(2) and (b)(3), a task that had previously been left entirely to the courts. Section 707(b)(2) sets forth the Means Test, which creates a rebuttable presumption of abuse if the debtor's current monthly income (CMI), reduced by statutorily permitted expenses, exceeds a certain threshold. Section 707(b)(3) sets forth additional considerations for the Court to evaluate in determining whether the case is abusive—specifically, "whether the debtor filed the petition in bad faith," or whether "the totality of the circumstances of … of the debtor's financial situation demonstrates abuse."

Courts and commentators have struggled to define the interaction between §§ 707(b)(2) and (b)(3). *See, e.g.,* In re *Johnson*, 399 B.R. 72, 75 (Bankr. S.D. Cal. 2008) ("What makes

the issue so difficult is trying to discern what interplay, if

any, Congress contemplated as between subsection (b)(2)—the

Means Test—and subsection (b)(3)—totality of the

circumstances."). At least one court has held, in support of the

Debtor's position, that "while ability to pay is a factor in the

totality of circumstances test, and may even be the primary

factor to be considered, if it is the only indicia of abuse, the

case should not be dismissed under that test." *In re Nockerts*,

357 B.R. 497 (Bankr. E.D. Wis. 2006). This view is shared by

commentators Culhane and White, who contend "that Congress

intended the means test to be the only test of ability to pay

under the revised Code":

> With the detailed statutory means test in place,
> "filed in bad faith" and "totality of the
> circumstances" no longer authorize judges to define
> ability to pay. Instead, these phrases must be read as
> limited to serious debtor misconduct.… The text and
> structure of the amended Code strongly suggest that
> the highly detailed means test is to replace, not just
> precede, other measures of ability to repay. Standard
> rules of interpretation direct courts to construe
> statutes so that all parts have meaning, and when both
> general and specific provisions cover the same subject
> matter, to let the specific provisions control. Use of
> judicial can-pay tests violates both of these rules,
> making the means test superfluous, and allowing
> general phrases to govern the specific. Section 707(b)
> as a whole makes sense when subsection two's means

1   test governs ability to pay and subsection three

2   covers debtor misconduct.

3   Marianne B. Culhane and Michaela M. White, *Catching Can-Pay*

4   *Debtors: Is the Means Test the Only Way?*, 13 Am. Bankr. Inst. L.

5   Rev. 665, 666-67 (2005).

6       But the majority of courts and commentators disagree with

7   the *Nockerts* court and with Culhane and White, holding instead

8   that the plain language of § 703(b)(3) permits consideration of

9   the debtor's ability to pay: "By its terms, § 707(b)(3)

10  'explicitly mandates that the totality of the circumstances of

11  the Debtor's financial situation be considered in determining

12  whether there is an abuse when the presumption of abuse under

13  paragraph (b)(2) does not arise or is rebutted.' The broad

14  language 'totality of the circumstances' and 'financial

15  situation' clearly encompasses a debtor's ability to pay." *In re*

16  *Lenton*, 358 B.R. 651, 663 (Bankr. E.D. Pa. 2006) (citing *In re*

17  *Paret*, 347 B.R. 12, 15 (Bankr. D. Del. 2006)). *See also In re*

18  *Zaporski*, 366 B.R. 758, 771 (Bankr. E.D. Mich. 2007) ("[The]

19  plain language [of § 707(b)(3)(B)] is broad enough to encompass,

20  indeed require, consideration of those facts that are probative

21  of a debtor's ability to repay his or her creditors."); *In re*

22  *O'Brien*, 373 B.R. 503, 506 ("This Court has observed, as have

23  others, that § 707(b)(3) is best understood as a codification of

24  pre-BAPCPA case law. Under pre-BAPCPA law, a debtor's ability to

25  pay was a primary consideration in any § 707(b) analysis."); *In*

26  *re McUne*, 358 B.R. 397, 398 (Bankr. D. Or. 2006) ("A debtor's

27  actual ability to pay a portion of his unsecured debts may be

28  considered as part of the totality of the circumstances of the

debtor's financial situation under § 707(b)(3).”); *In re Henebury*, 361 B.R. 595, 611 (Bankr. S.D. Fla. 2007) (“In determining [under § 707(b)(3)(B)] if the granting of relief would be an abuse of the provisions of Chapter 7, courts are required to determine if the debtor has the ability to pay a substantial portion of their unsecured claims through a Chapter 13 plan based upon the totality of the debtor's financial circumstances.”).

B.    *The § 707(b)(3)(B) Totality of the Circumstances Test Allows Courts to Fine-Tune the § 707(b)(2) Means Test Presumption*

The Court agrees with those authorities holding that the Means Test is only the first step in determining whether a debtor's petition is abusive. The Means Test functions as an initial screen to weed out those Chapter 7 petitions that are most clearly abusive. As one court explains, “Congress intended that there be an easily applied formula for determining when the Court should *presume* that a debtor is abusing the system by filing a chapter 7 petition.” *In re Fowler*, 349 B.R. 414, 420-21 (Bankr. D. Del. 2006). However, as with any bright-line rule, the Means Test presumption does not always provide the most accurate snapshot of the debtor's financial situation. That is to be expected; a formula complex enough to accurately predict every single debtor's ability to pay would be impossible to effectively administer. The Means Test sacrifices some level of accuracy in the interest of administrative efficiency.

Fortunately, the Bankruptcy Code anticipates that the Means Test alone cannot eliminate every single abusive filing and

provides a backstop, the § 707(b)(3)(B) totality of the
circumstances test. The totality of the circumstances test is
best seen as providing a chance for the Court to refine the
Means Test estimate. Since it permits individualized case-by-
case examination, the totality of the circumstances test can
weigh unusual circumstances that the Means Test does not—and
could not reasonably be expected to—account for.

For example, the Means Test computes a debtor's Current
Monthly Income (CMI) as the average of the debtor's income over
the past six months. In the case of debtors who have recently
changed jobs, CMI may bear little resemblance to actual monthly
income. In fact, Debtors whose CMI diverges from their actual
monthly income constitute a substantial portion of those debtors
who survive the Means Test only to see their cases dismissed
under the totality of the circumstances test. In *In re Pak*, the
Means Test presumption of abuse did not arise because the debtor
had been unemployed for most of the six months preceding his
bankruptcy petition. 343 B.R. 239, 241 (Bankr. N.D. Cal. 2006).
Substituting the debtor's actual monthly income for his CMI, the
*Pak* court concluded that the debtor had the ability to repay a
substantial portion of his unsecured debt, and accordingly
dismissed his case as abusive under the totality of the
circumstances test. *Id.* at 246–47. *See also Henebury*, *supra*, at
613–14 (dismissing case because debtor's newly acquired job
would provide substantial income to repay unsecured creditors).

Another way courts fine-tune the Means Test determination
is by considering a debtor's actual expenditures, which often
are not the same as the estimated expenditures used to determine

the Means Test presumption. For example, the Means Test permits

debtors to subtract from CMI payments on a residence they do not

plan on retaining (on the theory that such payments provide an

estimate of a debtor's eventual housing expenses). In *In re*

*Haar*, debtors passed the Means Test, largely because of

substantial mortgage payments on a residence they intended to

surrender. In conducting the totality of the circumstances

analysis, the court noted that debtor's monthly mortgage

payments of $2,243 had been replaced by monthly rental payments

of $888—leaving substantial income to pay unsecured creditors.

The *Haar* court dismissed the case as an abuse of Chapter 7. *See*

*also In re Edighoffer*, 375 B.R. 789, 794 (Bankr. N.D. Ohio 2007)

(considering debtor's actual rent expense, which was only one-

third of debtor's mortgage expense on property that was to be

surrendered, in conducting the totality of the circumstances

analysis).

C.   *The § 707(b)(3)(B) Totality of the Circumstances*

     *Determination Must Respect Policies Implicit in the*

     *§ 707(b)(2) Means Test*

     Although courts in the cases discussed above use the

totality of the circumstances test to refine the Means Test

determination, the adjustments the courts make are nonetheless

consistent with the underlying policies of the Means Test. By

contrast, in the present case, the UST asks the Court to use the

totality of the circumstances test in a manner that directly

contradicts the policies implicit in the Means Test.

Specifically, the UST asks the Court to classify the Debtors'

monthly secured debt payments as income available to repay

1  unsecured creditors, even though the Means Test allows such

2  payments to be deducted from CMI.

3      In the cases discussed above, the courts substituted

4  debtor's actual payments on various obligations for the

5  estimated payments used in the Means Test. In this case, the UST

6  is not asking the court to replace the Means Test's payment

7  estimate with a more precise estimate of the debtor's actual

8  payments. Instead, the UST requests that the entire amount of

9  income the Debtors allocate to secured debt payments debt be

10 considered as income available to pay unsecured creditors.

11 Rather than fine-tuning the Means Test presumption in accordance

12 with the facts of an individual case, the UST asks the Court to

13 completely disregard the policies implicit in the Means Test.

14     "It is a cardinal principle of statutory construction that

15 the statute ought, upon the whole to be so construed that, if it

16 can be prevented, no clause, sentence or word shall be

17 superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534

18 U.S. 19, 31 (2001). Congress has specified that for purposes of

19 determining the presumption of abuse, a debtor's monthly

20 payments on account of secured debt shall not be considered.

21 § 707(b)(2)(A)(iii). Considering such payments under the

22 § 707(b)(3)(B) totality of the circumstances test would render

23 the language in § 707(b)(2) disallowing consideration of those

24 payments superfluous. As the court in *In re Johnson*, *supra*,

25 aptly stated: "To the extent Congress' decision to not put some

26 cap on secured debt under § 707(b)(2) was based on some policy

27 concerns, … it would be wholly inconsistent for Congress to

28 address that policy concern in § 707(b)(2) with one hand, and

1  yank it right back with the other under § 707(b)(3)." *Johnson*,

2  399 B.R. at 78.

3  D.  *Dismissal Under the § 707(b)(3)(B) Totality of the*

4      *Circumstances Test is Justified if Additional Indicia of*

5      *Abuse are Present*

6      This is not to say that the Court may never classify a

7  debtor's secured debt payments as income available to pay

8  unsecured creditors. Such a classification may be appropriate

9  where other indicia of abuse are present. While it is impossible

10 to provide an exhaustive list of the myriad ways in which

11 debtors could abuse Chapter 7, common forms of abuse include

12 purchases made on the eve of bankruptcy and purchases that cause

13 the debtor to become insolvent. For example, one court invoked

14 the totality of the circumstances test to dismiss the debtor's

15 Chapter 7 petition based on the debtor's intent to reaffirm

16 secured-debt payments on an SUV purchased only twelve days prior

17 to filing. *In re Worrell*, 2007 WL 3374593, at *4 (Bankr. N.D.

18 Iowa 2007).

19      Defining eve-of-bankruptcy purchases by reference to a

20 precise timetable (e.g., a purchase made *X* days prior to filing

21 is presumptively abusive) would be counterproductive, as

22 enterprising debtors would simply consult the timetable and make

23 their purchases one day before. Furthermore, determining whether

24 an eve-of-bankruptcy purchase is abusive under the totality of

25 the circumstances test is a case-by-case inquiry that, as the

26 test suggests, must be made only after considering all the

27 relevant circumstances peculiar to each debtor's individual

28 case.

1    However, several generally applicable considerations are

2  worth noting. First, to avoid triggering a determination of

3  abuse, more expensive purchases must be made further in advance

4  of filing for bankruptcy than less expensive purchases. For

5  example, the presumption of abuse is more likely to be triggered

6  by a debtor who purchases a new $50,000 luxury car 120 days

7  before filing than it is by a debtor who purchases a $5,000 used

8  car 30 days before filing.

9    Whether a purchase is expensive must be evaluated in light

10 of the financial situation of each individual debtor. This can

11 be done by calculating the percentage of the debtor's monthly

12 income necessary to fund the purchase. To illustrate, the

13 purchase of a $20,000 car would be considered expensive as to a

14 debtor who was required to devote 40% of monthly income to the

15 payments; whereas the same purchase would not be considered

16 expensive as to a debtor required to devote only 5% of monthly

17 income to the payments. *See also Worrell*, *supra*, at *4 (filing

18 was abusive where debtors purchased two cars requiring total

19 payments equal to 38% of their monthly income; debtors purchased

20 one car twelve days before filing and the other ninety days

21 before filing).

22    Second, purchases that cause the debtor to become insolvent

23 generally give rise to a determination of abuse, regardless of

24 the length of time that elapses between the purchase and the

25 bankruptcy filing. The Bankruptcy Code is intended to afford

26 relief to the "honest but unfortunate debtor," not to the debtor

27 who makes purchases that she knows she cannot afford. *Brown v.*

28

*Felson*, 442 U.S. 127, 128 (1979) (citing *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)).

E.      *The Debtors' Petition Was Not Abusive Within the Meaning of the § 707(b)(3)(B) Totality of the Circumstances Test*

        This case does not present indicia of abuse sufficient to justify classifying the Debtors' secured-debt payments as income available to pay unsecured creditors, a classification that would require the Court to find that the Debtors' Chapter 7 petition is abusive. The Debtors did not incur the secured debt obligations at issue shortly before bankruptcy. Instead, the Debtors purchased the boat and the motor home two years prior to filing. Furthermore, the purchase of the boat and the motor home did not precipitate the Debtors' insolvency. At the time Debtors made the purchases in 2006, they had monthly income of $9,500. The total monthly debt service on the purchases was $1,156, or approximately 12% of the Debtors' monthly income. In 2007, Debtors' monthly income increased to $12,649; as a result, Debtors were required to devote only 9% of their monthly income to payments on the boat and motor home. Debtors were forced to file for bankruptcy not because they spent more on luxury goods than they could afford, but rather because the declining economy adversely impacted Debtor Kirk Jensen's salary.

F.      *Refusing to Permit Debtors to Retain Secured-debt Property Would Contravene the Favorable Treatment for Secured Creditors that Congress Expressly Provided for in § 707(b)(2)*

        Courts that have dismissed cases as abusive based on the debtor's high secured debt payments have emphasized the

1  unfairness to unsecured creditors. These courts understandably

2  bristle at the prospect of permitting debtors to continue

3  enjoying luxury goods at the expense of their unsecured

4  creditors. One court confronting the issue aptly observed that

5  "there is no practicable reason why the Debtors need to continue

6  maintaining a 'Pop-Up Camper' and an extra vehicle, the 2002

7  Ford Windstar." *In re Oot*, 368 B.R. 662, 667 (Bankr. N.D. Ohio

8  2007).

9       This Court certainly shares the discomfort other courts

10  have felt at the prospect of permitting debtors to retain luxury

11  goods in defiance of their unsecured creditors. However, the

12  Bankruptcy Code seeks to further policies other than making

13  unsecured creditors whole, especially in situations where

14  unsecured creditors can be made whole only at the expense of

15  secured creditors. Chief among these policies is advancing the

16  availability of secured credit. *See, e.g.*, *In re Proalert, LLC*,

17  314 B.R. 436, 441 (9th Cir. B.A.P. 2004) ("Embodied in the

18  Bankruptcy Code is a policy decision to protect secured credit

19  practices.").

20       Were the Court to adopt the UST's position, many debtors

21  would be forced to default on their secured credit obligations

22  as a precondition of obtaining Chapter 7 relief. The secured

23  creditors could look to the collateral to make them whole, but

24  in most cases would not be able to recover the entire obligation

25  because the collateral would be worth less than the debt.

26  Further, the costs of repossessing and reselling the collateral

27  would further reduce the secured creditor's recovery.

28

The case of *In re Oot* illustrates the problem from the perspective of secured creditors. In that case, the Court found "especially disconcerting" the debtors' decision to retain a vehicle whose value was at least $10,000 less than what was owed on it. *Oot*, *supra*, at 667. Viewing the situation exclusively from the perspective of unsecured creditors, the debtors' decision is indeed troubling—money that could go to unsecured creditors is instead devoted to making payments on a vehicle encumbered by far more debt than it is worth.

What the *Oot* court failed to account for is that the debtor's decision to retain secured-debt property is a zero-sum game, in which either secured creditors or unsecured creditors will emerge the winners. Had the Court permitted the debtors to retain the vehicle, their secured creditors would be spared the losses associated of disposing of the collateral, but their unsecured creditors would get nothing. Since the court did not allow the debtors to reaffirm the debt and retain the vehicle, their unsecured creditors received some recovery, but their secured creditors sustained losses of $10,000 plus the costs of liquidating the collateral.

Therefore, refusing to permit debtors to retain secured-debt property does more than punish the debtors—it also reallocates the balance of risk between secured and unsecured creditors. As one commentator has observed, in the zero-sum battle between secured and unsecured creditors, "the secured creditor's advantage is the unsecured creditor's disadvantage." Homer Kripke, *Law and Economics: Measuring the Economic Efficiency of Commercial Law in a Vacuum of Fact*, 133 U. Pa. L.

Rev. 929, 949 (1985). As demonstrated by the Means Test's provisions permitting the deduction of secured-debt obligations from CMI, Congress has conferred an advantage on secured creditors by giving debtors the option of retaining secured-debt property. Although Congress's choice to confer various advantages upon secured creditors is controversial,[6] it is a legislative choice that the Court will not disturb. Of course, the unintended but unavoidable consequence of this Congressional decision to favor secured credit is that some debtors will be able to retain luxury goods if they are willing to continue making the secured debt payments, even if that means their unsecured creditors will not always be made whole.

The Court also notes that an interpretation of § 707(b)(3) which permits debtors to continue making secured debt payments is consistent with other provisions of the Bankruptcy Code that extend favorable treatment to secured creditors. For example, § 363(e) entitles holders of secured claims to "adequate protection" of those claims under certain circumstances. As explained by the Supreme Court, § 363(e) requires the bankruptcy court to "place such limits or conditions on the trustee's power to sell, use, or lease [the secured creditor's] property as are

---

[6] *See, e.g.*, Lynn M. Lopucki, *The Unsecured Creditor's Bargain*, 80 Va. L. Rev. 1887, 1946-47 (1994) (lamenting the "unsecured creditors' loss of power when the case moves to bankruptcy" and describing bankruptcy as "the unsecured creditor's … nemesis"); Robert E. Scott, *A Relational Theory of Secured Financing*, 86 Colum. L. Rev. 901, 902 (1986) (noting that the "benefits to secured creditors from taking security are offset by the increased costs to unsecured creditors who face a corresponding reduction in the pool of assets available to them upon default.").

1    necessary to protect the creditor." *United States v. Whiting*

2    *Pools, Inc.*, 462 U.S. 198, 204 (1983). Similarly, secured

3    creditors are entitled to relief from the automatic if they can

4    satisfy the requirements of § 362(d).

5        Finally, substantial policy considerations support the

6    Court's holding. As one scholar has pointed out, an "essential

7    aspect of granting security, from the viewpoint of both the

8    secured creditor's interests and society's interest in plentiful

9    credit and rapid credit decisions, is the favored treatment of

10    secured creditors in the law of bankruptcy." Kripke, *supra*, at

11    948. Refusing to permit debtors to continue making secured debt

12    payments would take away one aspect of the favorable treatment

13    secured creditors receive in bankruptcy and would

14    correspondingly reduce the availability of secured credit. *Cf.*

15    Nobelman v. American Savings Bank, 508 U.S. 324, 332 (1993)

16    (Stevens, J., concurring) (explaining that the Bankruptcy Code's

17    "favorable treatment of residential mortgagees was intended to

18    encourage the flow of capital into the home lending market").

19    G.    *The Debtor's Failure to Execute a Reaffirmation Agreement*

20        *Does Not Render Their Chapter 7 Petition Abusive*

21        The UST argues that the Debtors' failure to execute a

22    reaffirmation agreement renders their Chapter 7 petition

23    abusive. Instead of electing to redeem the property pursuant to

24    § 722 or reaffirm the debt pursuant to § 524(c), the Debtors

25    indicated on their Statement of Intention that they would

26    "retain [the] collateral and continue to make regular payments."

27    According to the UST, the "Debtors here can still elect to

28    surrender the subject motor home and boat after entry of their

bankruptcy discharge with no consequences, including no liability for the un-affirmed contractual balance. This not-unlikely scenario would allow Debtors to retain all of the excess income which the [UST maintains] should be available to repay all of their unsecured creditors … pro-rata." Motion to Reconsider 17. The UST concedes that the Debtors' secured creditors "have not objected to [the Debtors'] failure to reaffirm." *Id.*

The option of retaining and continuing to make payments on secured property without reaffirming the debt or redeeming the property has been labeled "ride-through" or "retain and pay." Prior to the enactment of BAPCPA, courts in the Ninth Circuit held that Debtors had a right to elect ride-through even over a secured creditor's objections. *In re Parker*, 139 F.3d 668, 672 (9th Cir. 1998). That is, if debtors remained current on the property, the automatic stay remained in effect and lenders could not foreclose based solely on the debtors' breach of a bankruptcy default clause.

BAPCPA eliminated the debtor's right to elect ride-through in cases where secured creditors object. Section 521(a)(6) requires the debtor to reaffirm secured debt or redeem property within 45 days of the first § 341(a) meeting of creditors. If the debtor fails to reaffirm or redeem within the required time period, the automatic stay "is terminated with respect to the personal property of the estate or of the debtor which is affected, such property shall no longer be property of the estate, and the creditor may take whatever action as to such property as is permitted by applicable non-bankruptcy law."

§ 521(a)(6)(B). Further, the secured lender may be able to foreclose upon the property even if the debtor's payments are current. Section 521(d)—also added by BAPCPA—provides that bankruptcy default clauses are enforceable against debtors who fail to timely reaffirm or redeem.[7]

However, nothing in BAPCPA prevents debtors and secured creditors from engaging in what scholars have variously described as "voluntary ride-through," "creditor acquiescence," or "informal reaffirmations." *See* William C. Whitford, *A History of the Automobile Lender Provisions of BAPCPA*, 2007 U. Ill. L. Rev. 143, 154 (using the terms "voluntary ride-through" and "creditor acquiescence"); Karen Gross, *Perceptions and Misperceptions of Reaffirmation Agreements*, 102 Com. L.J. 339, 347-48 (1997) (using the term "informal reaffirmations"). In a voluntary ride-through, the secured creditor declines to exercise its legal remedies, allowing the debtor to retain the property provided the debtor continues making payments.

Prior to the enactment of BAPCPA, the voluntary ride-through was used in the five circuits which held that the debtor had no right to ride-through if the creditor objected.[8] For

---

[7] Section 521(d) provides in relevant part: "If the debtor fails timely to take the action specified in subsection (a)(6) of this section, …. Nothing in this title shall prevent or limit the operation of a provision in the underlying lease or agreement that has the effect of placing the debtor in default under such lease or agreement by reason of the occurrence, pendency, or existence of a proceeding under this title or the insolvency of the debtor."

[8] The First, Fifth, Sixth, Seventh, and Eleventh Circuit held that the pre-BAPCPA Bankruptcy Code did not afford debtors a right to the ride-through option. *See Bank of Boston v. Burr (In re Burr)*, 160 F.3d 843, 847-48 (1st Cir. 1998); *Johnson v. Sun*

example, a study by Culhane and White examined the disposition

of motor vehicles in bankruptcies in Georgia and Wisconsin,

jurisdictions in which pre-BAPCPA decisions held that debtors

did not have a right to elect ride-through over their creditors'

objections. *See generally* Marianne B. Culhane & Michaela M.

White, *Debt After Discharge: An Empirical Study of*

*Reaffirmation*, 73 Am. Bankr. L.J. 709 (1999) ("Study of

Reaffirmation"). The study found that in Georgia, 39% of the

vehicles were neither surrendered, redeemed, or reaffirmed (the

figure was 46% in Wisconsin). *Id.* at 740. The authors attempted

to trace the post-bankruptcy fate of these vehicles by

consulting Department of Motor Vehicles records. Of those

vehicles the authors were able to trace, a significant number

were still registered to debtors who had not redeemed or

reaffirmed. Presumably, the secured creditors permitted these

debtors to retain the vehicles and continue paying for them,

even though the creditors had the right to insist that the

vehicles be surrendered, redeemed, or reaffirmed. *Id.* One

commentator has predicted that voluntary ride-throughs may

actually increase post-BAPCPA as a result of the increased costs

of complying with the new disclosure requirements for an

enforceable reaffirmation agreement. *See* Jean Braucher, *Rash and*

*Ride-Through Redux: The Terms for Holding on to Cars, Homes and*

*Other Collateral Under the 2005 Act*, 13 Am. Bankr. L.J. 457,

463.

---

*Fin. Co. (In re Johnson)*, 89 F.3d 249, 252 (5th Cir. 1996); *Gen.
Motors Acceptance Corp. v. Bell (In re Bell)*, 700 F.2d 1053,
1058 (6th Cir. 1983); *Taylor v. Age Fed. Credit Union (In re
Taylor)*, 3 F.3d 1512, 1516 (11th Cir. 1993). *See also*

Were the Court to adopt the UST's position and find that the case is abusive based on the lack of a reaffirmation agreement, debtors wishing to retain secured-debt property would be required to reaffirm as a precondition of Chapter 7 relief. The reaffirmation requirement would apply even in cases, such as this one, where the secured creditors are willing to permit a voluntary ride-through. While BAPCPA's additional provisions enable secured creditors to prevent a ride-through, nothing in BAPCPA prevents secured creditors from acquiescing to a ride-through if they determine that doing so is in their best interests.

For a variety of reasons, creditors may conclude that forcing debtors to reaffirm is not in their interest. For example, secured creditors may determine that the additional protection they receive through a reaffirmation agreement is outweighed by the transaction costs associated with executing the agreement.[9] This may be particularly true where debtors demand concessions in exchange for executing a reaffirmation agreement.[10] Further, some debtors may refuse to execute a reaffirmation agreement, gambling that creditors would rather

---

[9] *See* Braucher, *supra*, at 463 ("[I]t should be noted that the increases costs of compliance with the new disclosure requirements for an enforceable reaffirmation agreement are likely to increase the willingness of creditors to acquiesce in ride-through.").

[10] *See* Culhane & White, Study of Reaffirmation, *supra*, at 741 ("Lenders might allow ride-through because the transaction costs and possible renegotiation of terms in the reaffirmation process may cost them more than the debtor's personal liability is worth.").

acquiesce to a voluntary ride-through than foreclose on

collateral worth less than the underlying debt.[11]

For whatever reason, it is clear that in some instances—
including in this case—secured creditors decide that their
interests are better served by acquiescing to a voluntary ride-
through  than taking advantage of BAPCPA's additional
protections. Indeed, as indicated by Culhane and White's Study
of Reaffirmation, prior to BAPCPA, a significant portion of
secured creditors in jurisdictions refusing to recognize the
debtor's right to ride-through nonetheless acquiesced to
voluntary ride-throughs. Requiring debtors who wish to retain
secured-debt property to execute a reaffirmation agreement, even
in situations where secured creditors have decided a
reaffirmation agreement is not in their interest, would be a
perverse interpretation of the BAPCPA provisions intended to
provide additional protections to secured creditors.

The Court is mindful of the UST's broader point—namely,
that the Debtors' failure to execute a reaffirmation agreement

[11] *See* Braucher, *supra* note 9, at 475 ("In non-ride-through
circuits under the pre-2005 Bankruptcy Code, chapter 7 debtors
frequently put creditors to the painful choice of either
accepting full payment on the debt, with contract interest, or
foreclosing on collateral. It is particularly difficult to
choose foreclosure when the collateral is worth less than the
debt. Therefore, when the debtor continued to pay the full debt
without reaffirming, often the creditor would take the money and
not foreclose, despite the fact that discharge makes the debtor
no longer personally liable. This is ride-through by creditor
acquiescence. Because the creditor would only recover wholesale
value less repossession and sale costs if it exercised its in
rem rights against personal property such as a vehicle, often
the creditor would accept the full payment with contract
interest.").

1  increases the probability that they will surrender the motor
2  home and boat post-discharge, given that they will no longer be
3  personally liable for the debt.  However, the mere possibility
4  that the Debtors may not follow through on their stated
5  intention of retaining the motor home and boat and continuing to
6  make regular payments cannot form the basis for a finding that
7  the Debtors' Chapter 7 petition is abusive. The Court must
8  decide the Motion to Dismiss based on the evidence presently
9  before it, rather than the possibility that the Debtor may or
10 may not take certain action in the future.

11 **Conclusion**

12      For the reasons stated above, the UST's Motion to Dismiss
13 Debtors' case for abuse under the § 707(b)(3)(B) totality of the
14 circumstances test is denied.

DATED: April 28, 2009

_____
United States Bankruptcy Judge

# SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*) **AMENDED MEMORANDUM OF DECISION** was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner indicated below:

**I.  SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s), the foregoing document was served on the following person(s) by the court via NEF and hyperlink to the judgment or order. As of April 26, 2009, the following person(s) are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email address(es) indicated below.

- Patti H Bass    ecf@bass-associates.com
- Alvin Mar    alvin.mar@usdoj.gov
- Mark J Markus    bklawr@bklaw.com, markjmarkus@gmail.com
- John P Pringle    jpringle@ecf.epiqsystems.com, johnppringle@earthlink.net
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page

**II.  SERVED BY THE COURT VIA U.S. MAIL:** A copy of this notice and a true copy of this judgment or order was sent by U.S. Mail to the following person(s) and/or entity(ies) at the address(es) indicated below:

**Debtors**
Kirk Lee Jensen
Linda Jean Jensen
313 S Glenwood Pl
Burbank, CA 91506

☐ Service information continued on attached page

**III.  TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by U.S. Mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following person(s) and/or entity(ies) at the address(es), facsimile transmission number(s) and/or email address(es) indicated below:

☐ Service information continued on attached page